# Illinois Official Reports

## Appellate Court

---

### *Stanphill v. Ortberg*, 2017 IL App (2d) 161086

---

| | |
|---|---|
| Appellate Court Caption | ZACHARY STANPHILL, Administrator of the Estate of Keith Stanphill, Deceased, Plaintiff-Appellant, v. LORI ORTBERG, Individually and as an Agent of Rockford Memorial Hospital, d/b/a Rockford Memorial Health Systems; and ROCKFORD MEMORIAL HOSPITAL, d/b/a Rockford Memorial Health Systems, Defendants-Appellees. |
| District & No. | Second District<br>Docket No. 2-16-1086 |
| Filed | October 31, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 14-L-35; the Hon. J. Edward Prochaska, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | Lori A. Vanderlaan and James F. Best, of Best, Vanderlaan & Harrington, of Naperville, for appellant.<br><br>Hugh C. Griffin, of Hall Prangle & Schoonveld, LLC, and Laura G. Postilion, of Quintairos, Prieto, Wood & Boyer, P.A., both of Chicago, for appellees. |

| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.<br>Justices McLaren and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1   The defendant, Lori Ortberg, performed a suicide screening of Keith Stanphill and determined that Stanphill was not at imminent risk of harming himself. Nine days after that screening, Keith killed himself. The plaintiff, Zachary Stanphill, Keith's son and the administrator of his estate, filed a wrongful death and survival action against Ortberg and her employer, Rockford Memorial Hospital. Following a jury trial, the jury returned a general verdict in the plaintiff's favor and awarded almost $1.5 million in damages. The jury, however, also answered in the negative a special interrogatory that asked whether Ortberg could reasonably foresee that Keith would commit suicide nine days after his meeting with her. The trial court entered judgment in favor of the defendants, based on the special interrogatory answer. The plaintiff appeals, arguing that the jury's answer to the special interrogatory was not irreconcilable with the general verdict or, alternatively, that the special interrogatory should never have been given. We reverse and remand with directions.

¶ 2                                          BACKGROUND

¶ 3   Between May 24 and June 2, 2016, the trial court conducted a jury trial on the plaintiff's complaint. The relevant portions of that trial are summarized below.

¶ 4   In the last month of his life, Keith's physical and psychological condition deteriorated substantially, based on his concerns that his wife, Susan, was having an extramarital affair. At the time of his suicide, he and Susan were no longer sleeping in the same house. From late August until September 30, 2005, he had lost nearly 15 pounds, he walked around in a lethargic state, he was pale, and his eyes were sunken. He was slipping in his performance at work as a car salesperson, and he had effectively withdrawn his participation in the church of which he had been a lifelong member. Susan believed he needed help and arranged for him to see a counselor through the Employee Assistance Program (EAP) at Rockford Memorial Hospital, which was a benefit provided under her health insurance plan through the Rockford School District.

¶ 5   On September 30, 2005, Keith met with Ortberg, a licensed clinical social worker who was employed by Rockford Memorial Hospital. Ortberg's responsibilities included assessing whether her patients posed threats of imminent suicide or potentially lethal violence. Ortberg had Keith complete a questionnaire as to his psychological condition. On that questionnaire, Keith indicated that he had (1) feelings of harming himself or others most of the time; (2) feelings of sadness most of the time; (3) sleep changes most of the time; (4) appetite changes all of the time; (5) feelings of anxiety, nervousness, worry, and fear all of the time; (6) sudden unexpected panic attacks most of the time; and (7) feelings of being on the verge of losing control most of the time. Keith also indicated on the questionnaire that he was seeing a primary care physician for "mood."

¶ 6    At trial, Ortberg testified that she had no specific recollections of Keith other than what was reflected in her chart of his meeting with her. Her chart indicated that Keith denied having ideas of suicide or a plan of how he would commit such an act. Her chart also indicated that he had lost weight and was taking an anti-depressant. She was not able to reconcile the conflict between Keith's answers to the questionnaire, indicating that he had thoughts of harming himself, and her conclusion in her chart that he did not have ideas of suicide. Her chart did not indicate (1) how much weight Keith had lost over what period of time, (2) what his eating or sleeping disturbances entailed, (3) any trouble he was having at work, or (4) how he physically presented himself. Ortberg acknowledged that issues involving sleep, appetite, work life, changes in mood, and changes in concentration or focus were all signs of depression that could lead someone to being suicidal.

¶ 7    Ortberg diagnosed Keith with adjustment disorder with depressed mood and referred him to a marriage counselor. Ortberg acknowledged that Keith's answers to the self-assessment questionnaire were indicators of depression. She further acknowledged that major depression is much more severe than adjustment disorder with depressed mood and that there is a correlation between major depression and suicide.

¶ 8    Ortberg testified that when she determines that a patient is suicidal, the standard of care requires certain actions on her part. Specifically, she would (1) not let the patient leave her office, (2) call a family member and have them pick up the patient and take them to an emergency room and explain the situation, and (3) if a family member could not be contacted, call 911 or the police and take whatever steps are necessary to get the patient to the emergency room to be evaluated. Ortberg acknowledged that she took none of those steps in Keith's case.

¶ 9    On October 4, 2005, Susan called the EAP office to confirm that Keith had scheduled an October 11 appointment with the marriage counselor whom Ortberg had recommended. However, on October 9, 2005, Keith was found dead on the floor of his garage with his car ignition on and the gas tank empty. He left a suicide note, attaching copies of romantic e-mails between Susan and her coworker. An autopsy determined that Keith had died from asphyxia resulting from acute carbon monoxide poisoning.

¶ 10    Keith's estate filed a wrongful death action against Ortberg and Rockford Memorial Hospital in 2007 and then refiled it on February 7, 2014. At trial, both parties called experts in the area of social work and psychiatry to review the counseling that Ortberg had provided Keith.

¶ 11    Daniel Potter, a licensed clinical social worker for 22 years, testified as an expert for the plaintiff. He testified that Ortberg breached the standard of care by failing to recognize that Keith was suicidal. Ortberg failed to do a proper mental health evaluation, lethality assessment, and mental status exam. Potter testified that, had Ortberg performed a proper mental health assessment, she would have recognized that Keith was suicidal—thus triggering a duty to take immediate action. Potter further testified that Ortberg had breached the standard of care by misdiagnosing Keith as having adjustment disorder, when in fact he had major depression. Potter explained that there is a high correlation between major depression and suicide. Potter believed that Ortberg's misdiagnosis of adjustment disorder was the reason she failed to recognize that Keith was suicidal.

¶ 12    Terri Lee, a licensed clinical social worker, testified as a defense expert. She stated that Ortberg conducted a thorough assessment and complied with the standard of care for a

reasonably careful licensed clinical social worker in her one-hour counseling session with Keith. Lee believed that Keith was not suicidal on the day he met with Ortberg. This was evident because he scheduled a follow-up date with the counselor whom Ortberg had recommended. Lee testified that someone who is planning to kill himself does not make an appointment for a future date.

¶ 13 Dr. David Bawden, the plaintiff's expert psychiatrist, testified that he had been practicing for 37 years and evaluated 10 to 20 people per day for suicidal risk. He worked in psychiatric hospitals and had been called into emergency rooms to evaluate patients for suicidal risk and involuntary admission. He had extensive training in what happens when there is a referral to an emergency room, a psychiatrist, or a psychiatric facility and the evaluation that must be conducted for involuntary admission.

¶ 14 Dr. Bawden testified that he agreed with Potter's opinions concerning Ortberg's failure to recognize Keith as suicidal, her misdiagnosis of his level of depression, and her failure to properly assess his mental health. Dr. Bawden testified that each of those failures, individually, was a proximate cause of Keith's death. He believed that Keith had a high risk of suicide on September 30, 2005, and that, had he been referred to an emergency room or a psychiatrist or a psychiatric facility, his suicide could have been prevented. He explained that the vast majority of persons who are suicidal and treated, whether on voluntary or involuntary admission, ultimately are released safely. He testified that Ortberg's failure to properly refer Keith to an emergency room or a psychiatrist was a cause of Keith's death.

¶ 15 Dr. Steven Hanus, the defendants' expert psychiatrist, testified that it was not reasonably foreseeable to Ortberg on September 30, 2005, that Keith would kill himself on or before October 9, 2005. He believed that Keith was not at imminent risk of harming himself because (1) Ortberg specifically documented that Keith had no ideas of suicide, (2) he had not made a suicide attempt before, (3) there was no family history of suicide, (4) the EAP documentation demonstrated that Keith was working, (5) he was religious and receiving pastoral care, (6) he was living with his in-laws, with whom he had a close relationship, (7) he was seeing his children every day, (8) he was keeping up with his hygiene, (9) at the end of the EAP session, he had agreed to outpatient therapy, and (10) he had actually scheduled a follow-up appointment. Dr. Hanus believed that someone who was suicidal would not schedule a follow-up counseling appointment for some future date. Dr. Hanus opined that, even if Ortberg had referred Keith to a psychiatrist or an emergency room on September 30, 2005, Keith's suicide would not have been foreseeable to a psychiatrist or to hospital personnel on that date, for the same reasons that Keith's suicide was not foreseeable to Ortberg.

¶ 16 At a jury instruction conference, the defendants asked the court to submit a special interrogatory to the jury regarding the foreseeability of Keith's suicide. The interrogatory read as follows:

> "Was it reasonably foreseeable to Lori Ortberg on September 30, 2005 that Keith Stanphill would commit suicide on or before October 9, 2005?"

The defendants drew the wording of the interrogatory from *Garcia v. Seneca Nursing Home*, 2011 IL App (1st) 103085. The plaintiff objected to the interrogatory, arguing that Keith's death was "not reasonably foreseeable under [the plaintiff's] theory in the case to Lori Ortberg because she didn't do a full assessment, she didn't do the right diagnosis, *** she didn't do the job [and] [s]he didn't meet the standard." As the jury could reasonably answer the special interrogatory "no" based on a finding that Ortberg had breached the standard of

care, the plaintiff maintained that the question did not test the general verdict and therefore should not be given. The trial court overruled the objection and submitted the interrogatory to the jury.

¶ 17 In closing arguments, the plaintiff encouraged the jury to vote "yes" on the special interrogatory. The defendants encouraged the jury to answer the question "no."

¶ 18 The jury returned a general verdict finding the defendants liable for negligence and awarding the plaintiff $1,495,151. However, the jury also answered the special interrogatory in the negative, finding that it was not reasonably foreseeable to Ortberg that Keith would commit suicide within nine days of his meeting with her. Based upon the jury's answer to the special interrogatory, the trial court entered judgment in favor of the defendants.

¶ 19 The plaintiff filed a motion to reconsider the judgment on the special interrogatory and to enter judgment on the general verdict. Following a hearing, the trial court denied the plaintiff's motion. The trial court explained that it was bound by the decision in *Garcia*, which had entered judgment in favor of the defendant based on a similar special interrogatory. The trial court, however, questioned the correctness of the decision in *Garcia*, stating:

"I think *Garcia* was wrongly decided. I think *Garcia* is an anomaly. I don't think *Garcia* sets forth what the law of the State of Illinois is or should be with respect to whether or not suicide is reasonably foreseeable. How in the world can a jury figure out how to answer that question? [I]t says was it reasonably foreseeable to Lori Ortberg, the defendant.

How can that not be ambiguous? I can't imagine how that can't be ambiguous. Because Lori Ortberg was charged with several elements of negligence, one of which was that she didn't foresee the suicide. It was one of the things that the jury had to consider in terms of whether she was negligent. It was the number one thing. The whole trial was about whether or not she should have foreseen the suicide. It's throughout the record.

And—and so—and the jury found in favor of the plaintiff. They found that she was negligent. And so we have to consider that special interrogatory as saying this: Was it reasonably foreseeable to a negligent Lori Ortberg that this suicide was—that Keith Stanphill would commit suicide on or such a date[?] ***

And so how can we issue a special interrogatory about Lori Ortberg before we know what the jury—whether she was negligent or not negligent. How can that not be ambiguous? Because it seems to me it's perfectly understandable that the jury would find that she was negligent, award—award damages to the plaintiff, and then say all right, was it reasonably foreseeable to Lori Ortberg? No, it wasn't foreseeable to her, she was negligent. So no, it wasn't foreseeable to Lori Ortberg because she was negligent. She didn't foresee it was suicide, we already found that, so we're going to check that box no.

That makes perfect sense to me, and that's one of the arguments the plaintiff[ ] [has] raised here, that it's consistent with the verdict. And yet the *Garcia* Court approved that special interrogatory.

* * *

*Garcia* is the case that the Second Appellate District needs to take a good, strong, hard look at and decide whether or not it was properly decided or wrongly decided.

I think it was wrongly decided. I think if we're going to give any kind of a special interrogatory in a suicide case where the defendant is allegedly negligent for not foreseeing the suicide, that the special interrogatory needs to not have the defendant's name in it. It needs to say was it foreseeable or was it reasonably foreseeable to a reasonably careful social worker that so and so would commit suicide on such and such a date.

That's what it should say if we're going to give special interrogatories at all in a case like this. It shouldn't have the defendant's name because it throws terrible ambiguity into the special interrogatory.

And if there's one thing Illinois case law is clear about, it's that you shouldn't give an ambiguous special interrogatory. It should be clear. This is anything but clear. It's—it's muddy.

\* \* \*

I think the Second District should take a hard look at *Garcia*, and if they find that plaintiff[']s arguments are appropriate, which, quite frankly, I think they are, then it should not follow *Garcia* and it should reverse this case and enter judgment in favor of the plaintiff[ ]."

¶ 20 Following the trial court's ruling, the plaintiff filed a timely notice of appeal.

¶ 21                                                                    ANALYSIS

¶ 22 On appeal, the plaintiff contends that the trial court erred in either (1) entering judgment in the defendants' favor because the jury's answer to the special interrogatory was not irreconcilable with the general verdict or (2) giving the special interrogatory because it was not in the proper form.

¶ 23 At the outset, we note that the defendants argue that the plaintiff forfeited his objection to the special interrogatory because he failed to object to the specific form of the special interrogatory. Generally, a party's failure to raise a specific objection to the form of an interrogatory forfeits that ground for appeal. *Morton v. City of Chicago*, 286 Ill. App. 3d 444, 450 (1997). Based on our review of the record, we believe that the plaintiff sufficiently objected to the form of the interrogatory in the trial court. We will therefore consider the merits of his appeal.

¶ 24 Special interrogatories are governed by section 2-1108 of the Code of Civil Procedure (735 ILCS 5/2-1108 (West 2016)), which reads in full as follows:

"Verdict—Special interrogatories. Unless the nature of the case requires otherwise, the jury shall render a general verdict. The jury may be required by the court, and must be required on request of any party, to find specially upon any material question or questions of fact submitted to the jury in writing. Special interrogatories shall be tendered, objected to, ruled upon and submitted to the jury as in the case of instructions. Submitting or refusing to submit a question of fact to the jury may be reviewed on appeal, as a ruling on a question of law. When the special finding of fact is inconsistent with the general verdict, the former controls the latter and the court may enter judgment accordingly."

We review *de novo* as a question of law a trial court's decision on whether to give a special interrogatory that has been requested by a party. See *id.*

¶ 25    Special interrogatories are designed to be the "guardian of the integrity of a general verdict in a civil jury trial," and they "test[ ] the general verdict against the jury's determination as to one or more specific issues of ultimate fact." (Internal quotation marks omitted.) *Simmons v. Garces*, 198 Ill. 2d 541, 555 (2002). As section 2-1108 explains, an answer to a special interrogatory controls the judgment when it is "inconsistent" with the general verdict. 735 ILCS 5/2-1108 (West 2016). The special interrogatory controls, however, only when it is "clearly and absolutely irreconcilable with the general verdict." (Internal quotation marks omitted.) *Simmons*, 198 Ill. 2d at 556. As the supreme court has explained:

> "If a special interrogatory does not cover all the issues submitted to the jury and a 'reasonable hypothesis' exists that allows the special finding to be construed consistently with the general verdict, they are not 'absolutely irreconcilable' and the special finding will not control. [Citation.] In determining whether answers to special interrogatories are inconsistent with a general verdict, all reasonable presumptions are exercised in favor of the general verdict. [Citation.]" *Id.*

¶ 26    The trial court's duty to instruct the jury to answer a special interrogatory arises only when the interrogatory is in the proper form. *Garcia*, 2011 IL App (1st) 103085, ¶ 49. "[A] special interrogatory is in proper form if (1) it relates to an ultimate issue of fact upon which the rights of the parties depend, and (2) an answer responsive thereto is inconsistent with some general verdict that might be returned." *Simmons*, 198 Ill. 2d at 563. Additionally, the interrogatory "should be a single question, stated in terms that are simple, unambiguous, and understandable; it should not be repetitive, confusing, or misleading." *Id.*

¶ 27    We observe that our court addressed a similar alleged inconsistency between a general verdict and a special interrogatory in *Lancaster v. Jeffrey Galion, Inc.*, 77 Ill. App. 3d 819, 826 (1979). In *Lancaster*, the plaintiff was injured in a road paving accident by a tandem roller manufactured by the defendant. The defendant asserted that the plaintiff's injuries were a result of coworker Ronald Herbig's misuse of the roller. *Id.* at 820. Over the plaintiff's objection, the trial court gave the jury the following special interrogatory that the defendant had requested:

> " 'Does the jury find from a preponderance of the evidence that the misuse of the roller by Ronald Herbig, an employee of Rockford Blacktop, was the proximate cause of the injuries sustained by the plaintiff in the occurrence in question?' " *Id.* at 821.

The jury returned a general verdict in the plaintiff's favor, but answered affirmatively to the special interrogatory. The trial court determined that the jury's findings were inconsistent and therefore entered judgment for the defendant. *Id.*

¶ 28    On appeal, this court reversed, holding that the general verdict and the special interrogatory were not necessarily inconsistent. We explained that the jury's general verdict implicitly found that the roller was in an unreasonably dangerous condition when it left the manufacturer's control and that the roller was being used and operated in a manner either intended or reasonably foreseeable. *Id.* at 823-24. We concluded that the jury's answering "yes" to the question of whether the injury was caused by Herbig's misuse was not inconsistent with the jury's general verdict, as its general verdict implicitly found that the misuse was reasonably foreseeable to the manufacturer. *Id.* at 824.

¶ 29    Here, as in *Lancaster*, we hold that the general verdict and the answer to the special interrogatory are not necessarily inconsistent. The plaintiff's theory at trial was that Ortberg was negligent in the performance of her duties when she counseled Keith on September 30, 2005. A juror could conclude that, because she was negligent, it was not reasonably foreseeable to her that Keith would commit suicide approximately nine days after he met with her. As the general verdict and the answer to the special interrogatory were not clearly and absolutely irreconcilable, the trial court should have entered judgment in favor of the plaintiff. See *Simmons*, 198 Ill. 2d at 556.

¶ 30    Even if we were to construe the general verdict and the answer to the special interrogatory as inconsistent, we would still hold that the answer should not prevail over the general verdict because the special interrogatory was not in the proper form. In addressing the foreseeability of Keith's suicide, the special interrogatory was really asking whether Ortberg's conduct was a proximate cause of Keith's suicide. Proximate cause is one of three elements a plaintiff must prove to succeed in a negligence action: (1) the defendant owed a duty of care, (2) the defendant breached that duty, and (3) the plaintiff's resulting injury was proximately caused by the breach. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 114 (1995). Whether the defendant owed a duty to the plaintiff is a question of law to be decided by the court. *Id.* Whether the defendant breached his duty and whether the breach was the proximate cause of the injury are factual questions for a jury to decide, as long as there is a genuine issue of material fact about breach and causation. *Id.*

¶ 31    A claim of medical malpractice is proven when the plaintiff shows that there was a standard of care by which to measure the defendant's conduct, the defendant negligently breached that standard of care, and the defendant's breach was the proximate cause of the plaintiff's injury. *Northern Trust Co. v. University of Chicago Hospitals & Clinics*, 355 Ill. App. 3d 230, 241 (2004). A plaintiff must prove these elements by presenting expert medical testimony. *Id.* at 242.

¶ 32    There are two requirements for a showing of proximate cause: cause in fact and legal cause. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455 (1992); see also *Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 556 (2005). At issue in this case is legal cause. Legal cause is established if an injury was foreseeable as the type of harm that a *reasonable person* would expect to see as a likely result of his conduct. *Lee*, 152 Ill. 2d at 456. Although the foreseeability of an injury will establish legal cause, the extent of the injury or the exact way in which it occurs need not be foreseeable. *Knauerhaze*, 361 Ill. App. 3d at 556 (citing *Colonial Inn Motor Lodge, Inc. v. Gay*, 288 Ill. App. 3d 32, 45 (1997)). By requiring a plaintiff to show legal cause for an injury, the law sets limits on how far a defendant's legal responsibility should extend for his actions. *Lee*, 152 Ill. 2d at 455. Accordingly, here, it would have been appropriate to submit a special interrogatory on the question of foreseeability, as assurance from the jury that it found Keith's suicide to be the type of injury that a reasonable person would expect to see as a likely result of the defendants' conduct. See *Hooper v. County of Cook*, 366 Ill. App. 3d 1, 7 (2006).

¶ 33    However, the special interrogatory presented to the jury was not in the proper form because it did not ask whether Keith's suicide was foreseeable as the type of harm that a *reasonable person* (or a *reasonable* licensed clinical social worker) would expect to see as a likely result of her conduct. See *Lee*, 152 Ill. 2d at 456. Rather, the interrogatory asked whether Keith's suicide was foreseeable to Ortberg. By substituting "Lori Ortberg" for a

"reasonable person" or a "reasonable licensed clinical social worker," the interrogatory distorted the law and became ambiguous and misleading to the jury. Although a reasonable person or a reasonable licensed clinical social worker might have been able to foresee Keith's suicide, that does not mean that Ortberg (who according to the plaintiff's theory did not act reasonably) would have. As such, the interrogatory was confusing and should not have been given. See *Simmons*, 198 Ill. 2d at 563.

¶ 34    In so ruling, we reject the defendants' contention that *Garcia* requires us to reach a different result here. In *Garcia*, the decedent was a resident of the defendant nursing home when he ejected himself from a fifth-floor window, causing his own death. *Garcia*, 2011 IL App (1st) 103085, ¶ 1. The decedent's estate filed a wrongful death and survival action against the defendant. At trial, upon the defendant's request, the trial court gave the following special interrogatory:

> " 'Prior to Roberto Garcia's death, was it reasonably foreseeable to [the defendant] that he would commit suicide or act in a self-destructive manner on or before April 21, 2004.' " *Id.* ¶ 10.

The jury entered a general verdict for the estate but answered the special interrogatory in the negative. The trial court therefore entered judgment in favor of the defendant. *Id.* ¶ 13.

¶ 35    On appeal, the plaintiff argued that the interrogatory was not in proper form because the jury was required to make the following four factual findings: "(1) [whether] Roberto committed suicide, and (2) if so, was it foreseeable, or (3) whether Roberto committed a self-destructive act, and (4) if so, was it foreseeable?" *Id.* ¶ 51. The reviewing court disagreed and affirmed the trial court's decision, finding that the question was properly phrased as a single question regarding the foreseeability of two alternatives in the disjunctive and that an affirmative answer to either alternative required an affirmative answer to the entire interrogatory. *Id.* Thus, the court concluded that the interrogatory's construction was not impermissibly compound. *Id.*

¶ 36    We note that the plaintiff in *Garcia* did not raise, and the reviewing court did not consider, whether the interrogatory was improper because it tested foreseeability through the eyes of the individual defendant rather than a reasonable person. As the *Garcia* court did not consider that issue, its decision cannot establish that the proper basis to test foreseeability is through the eyes of the individual defendant. See *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (a decision that does not squarely address an issue allows the issue to be addressed on the merits at a later date); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) (issue not "raised in briefs or argument nor discussed in the [previous] opinion of the Court" cannot be taken as "a binding precedent on th[e] point"); *Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

¶ 37    Although *Garcia* did not squarely address the issue, the defendants insist that numerous other cases have held that a defendant will not be found negligent if the harm that befell the plaintiff was not foreseeable to the individual defendant. We disagree with the defendants' characterization of the law. Our supreme court has repeatedly held that the appropriate test for foreseeability is whether a reasonable person would anticipate the harm that occurs to the plaintiff. See *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 406 (2004) (the

relevant inquiry is whether the injury is of a type that a reasonable person would see as a likely result of his conduct); *Lee*, 152 Ill. 2d at 455 (same).

¶ 38     By contrast, in the litany of cases they cite, the defendants rely upon only one Illinois Supreme Court case—*American National Bank & Trust Co. of Chicago v. National Advertising Co.*, 149 Ill. 2d 14, 29 (1992). That case, however, does not advance the defendants' cause. In *American National Bank*, the supreme court addressed foreseeability in the context of duty, not proximate cause. See *Beretta*, 213 Ill. 2d at 394 (the question of foreseeability plays a pivotal role in both the question of the existence of a duty and the determination of legal cause). Although "reasonable foreseeability" is relevant to both duty and proximate cause, courts must take care to keep duty and proximate cause analytically independent by differentiating between "two distinct problems in negligence theory—the unforeseen plaintiff problem and the problem of the foreseeable injury resulting from unforeseen means." (Internal quotation marks omitted.) *Colonial Inn Motor Lodge*, 288 Ill. App. 3d at 41. Since *American National Bank* dealt with the duty element of negligence, its discussion of foreseeability is inapplicable here. See *Hooper*, 366 Ill. App. 3d at 10.

¶ 39     Moreover, we also reject the defendants' argument that, in light of the proper jury instructions and the plaintiff's counsel's closing statement asking the jury to vote "yes" on the special interrogatory, this court should find that the general verdict and the answer to the special interrogatory were inconsistent and therefore affirm the trial court's judgment. The test for construing the meaning of a jury instruction "is not what meaning the ingenuity of counsel can at leisure attribute to the instructions, but how and in what sense, under the evidence before them and the circumstances of the trial, ordinary men acting as jurors will understand the instructions." *Reivitz v. Chicago Rapid Transit Co.*, 327 Ill. 207, 213 (1927). Here, the trial court itself stated that it found the special interrogatory ambiguous and confusing. The trial court's difficulty in deciphering the special interrogatory is compelling evidence that the jury likely would have experienced similar confusion. Consequently, even though the plaintiff's counsel requested the jury to vote "yes" on the special interrogatory, that does not negate the ambiguity in the interrogatory.

¶ 40     We next turn to the defendants' argument that we should affirm on the alternate basis that the plaintiff failed to establish proximate cause. In making this argument, the defendants essentially ask us to enter judgment in their favor notwithstanding the jury's general verdict in favor of the plaintiff. Judgment notwithstanding the verdict should not be entered unless the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 109 (1997). We do not believe that the evidence in the case at bar so overwhelmingly favors the defendants that no contrary verdict could ever stand.

¶ 41     Proximate cause means any cause that, in natural or probable sequence, produced the complained of injury. *Capiccioni v. Brennan Naperville, Inc.*, 339 Ill. App. 3d 927, 937 (2003). It need not be the sole cause or the last or nearest cause. *Shannon v. Boise Cascade*, 336 Ill. App. 3d 533, 543 (2003). Issues involving proximate cause are fact-specific and therefore uniquely for the jury's determination. *Holton*, 176 Ill. 2d at 107. When a plaintiff comes to a hospital already injured and while in the care of the hospital is negligently treated, the question of whether the defendant's negligent treatment is a proximate cause of the plaintiff's ultimate injury is ordinarily one of fact for the jury. *Id.*

¶ 42       Here, Potter testified that Ortberg had misdiagnosed Keith as not being suicidal when she had evaluated him. Ortberg acknowledged that, had she diagnosed Keith as suicidal, it would have been her duty to take steps to get him further care from a mental health specialist. Because Ortberg did not refer Keith to a mental health specialist, the jury could reasonably infer that Ortberg had breached her duty of reasonable care.

¶ 43       Dr. Bawden testified that one who has suicidal thoughts has a very treatable condition and that if Ortberg had properly referred Keith, Keith would not have killed himself. Dr. Bawden's testimony was sufficient for the jury to conclude that Ortberg's misdiagnosis and misevaluation of Keith was a proximate cause of his death. *Cf. Holton*, 176 Ill. 2d at 107-08 (defendant nurses' failure to accurately and timely report plaintiff's information to doctors was proximate cause of plaintiff's injuries because nurses' conduct prevented doctors from having opportunity to treat her condition); *Wodziak v. Kash*, 278 Ill. App. 3d 901 (1996) (evidence was sufficient to establish that defendant's delay in diagnosing the decedent's illness lessened the effectiveness of the treatment, and plaintiff was not required to show in absolute terms that a different outcome would have occurred had defendant made an earlier diagnosis of the decedent's condition).

¶ 44       The defendants point to several cases in which courts have found that a lack of expert testimony prevented the plaintiffs from establishing that the defendants' conduct was a proximate cause of the plaintiffs' injuries. See, *e.g.*, *Snelson v. Kamm*, 204 Ill. 2d 1, 42-43 (2003); *Wiedenbeck v. Searle*, 385 Ill. App. 3d 289, 298-99 (2008); *Townsend v. University of Chicago Hospitals*, 318 Ill. App. 3d 406, 414-15 (2000); *Susnis v. Radfar*, 317 Ill. App. 3d 817, 825-27 (2000); *Aguilera v. Mount Sinai Hospital Medical Center*, 293 Ill. App. 3d 967, 974-76 (1997). The defendants argue that, because Dr. Bawden was not an emergency room physician, he could not provide expert testimony as to whether a referral to an emergency room would have prevented Keith's suicide. Absent such expert testimony, the defendants insist that this court must enter judgment in their favor.

¶ 45       The plaintiff points out that the defendants made no objection at trial to the foundation of Dr. Bawden's opinion, and therefore he contends that the defendants' objections to his testimony now on appeal are forfeited. We agree. See *Mabry v. Boler*, 2012 IL App (1st) 111464, ¶ 15 (arguments not raised before the trial court are forfeited and cannot be raised for the first time on appeal). Further, even overlooking the defendants' forfeiture, based on Dr. Bawden's qualifications as a psychiatrist for 37 years with extensive experience in evaluating patients in an emergency room setting, we believe that he was able to provide expert testimony as to whether a referral to an emergency room or a psychiatrist would have prevented Keith's suicide. The defendants' contention to the contrary, therefore, is without merit.

¶ 46                                          CONCLUSION

¶ 47       For the foregoing reasons, the judgment of the circuit court of Winnebago County is reversed, and the cause is remanded with directions to enter judgment for the plaintiff on the general verdict.

¶ 48       Reversed and remanded with directions.